PRODUCCIONES GRAN ESCENARIO,
INC. Plaintiff

v.

Miguel RUIZ, et al.   Defendants

No. CIV. 03–2061(HL).

United States District Court,
D. Puerto Rico.

March 22, 2004.

Roberto O. Maldonado–Nieves, Roberto O. Maldonado Nieves Law Office, San Juan, PR, for Plaintiff.

Heriberto Guivas–Lorenzo, Pedro Ortiz Alvarez Law Offices, Ponce, PR, for Defendant.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Before the Court is defendants' request to set aside the preliminary and permanent injunction issued by the Court. (Dkts.9, 11, 14). Defendants, the Municipality of Aguada ("Municipality"), its mayor and other officials argue that plaintiff Producciones Gran Escenario, Inc ("PGE") should be barred from performing "Chico Cantando y Desnudos" at the Municipality's Performing Arts Center ("Center"). In response, plaintiff argues that the Municipality's attempt to shut down their production is a violation of their First Amendment rights under the Constitution of the United States.

### Facts and Procedural History

On September 30, 2003, plaintiff filed a complaint and a motion for a temporary restraining order, preliminary injunction and permanent injunction against defendants. (Dkt.3). Plaintiff argued that they had a binding contract with the Municipality to perform their adaption of the Broadway musical "Naked Boys Singing." The show, "Chicos Cantando y Desnudos", was scheduled to be performed on October 10, 11, and 12 at the Municipality's Center. Plaintiff had already reserved those dates and paid the Municipality, in advance, 50% of the cost of the lease. (Dkt.3). However, on August 26, 2003, defendants notified plaintiff by letter that the musical would be cancelled due to "last moment reasons and of much weight." (Dkt.36).

The case was initially assigned to Judge Garcia–Gregory who promptly denied the

motion for a temporary restraining order and simultaneously ordered the parties to appear before his Court in order to conduct a preliminary injunction hearing. (Dkt.5) At that hearing, held on October 6, 2003, defendants failed to appear before the Court. Accordingly, Judge Garcia–Gregory granted plaintiff's motion for a preliminary and permanent injunction enjoining defendants "from directly or indirectly prohibiting or barring PGE from producing the play 'Chicos Cantando y Desnudos' at the Centro de Bellas Artes de Aguada." (Dkt 9). Judge Garcia–Gregory anchored this order on the Supreme Court's decision in *Southeastern Promotions L.T.D. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) which involved facts almost identical to the ones at the heart of this case. (Dkt.9).[1]

On the same day that the preliminary and permanent injunction order went into effect, defendants filed their first appearance before the Court requesting urgent "relief from judgment." (Dkt.11). In their motion, defendants explained that they had failed to "notice" the Court's order in a timely manner because it had been given to them within a "stack of documents." Moreover, they argued that because "[d]efendants are not knowledgeable in legal matters or procedures....they were not aware of the time restrictions imposed by the nature of the present case."[2] (Dkt.11). As a result, Judge Garcia–Gregory granted defendants' motion allowing them an opportunity to file this motion to set aside the injunction. (Dkt.13). After receiving and reviewing defendants' motion and plaintiff's opposition, Judge Garcia–Gregory, stayed the proceedings and "disqualifie[d] himself from any further participation in this case." (Dkt.23). The case was immediately transferred to the undersigned and the stay was lifted. After reviewing the pleadings, this Court noted that defendants' attempt to distinguish the facts of this case with those of *Southeastern Promotions* were based largely in part on the text of the Municipality's Ordinance 4, Series 2002–2003. Accordingly, the Court ordered defendants to provide a certified translation of the ordinance that established the Center. (Dkt.26). Defendants complied with this instruction, but also included a translation of an additional ordinance that was adopted by the Municipali-

---

1. *Southeastern Promotions* involved a dispute between the producers of the musical Hair and the administrators of the public theater in Chattanooga, Tennessee. The administrators determined that the musical was obscene and therefore denied plaintiffs' request to produce the play at the theater. The Supreme Court held that this was a violation of plaintiffs' rights under the First Amendment because the defendants had failed to "provide the public, and in particular the play's producers, with any prior standards nor a process through which to determine whether the contents of a particular play or speech could be exercised in that public forum. The Supreme Court condemned the lack of standards and process, considering the prohibition of expression as an unconstitutional form of prior censorship by the State." (Dkt.9).

2. The Court finds this explanation most unpersuasive. According to the record, copies of the order setting the preliminary injunction hearing and the summons were served on the office of the Director of Culture and Tourism, the office of the Administrator of the Center, and the legal office of the Municipality. The Court finds it incredulous that none of these documents were reviewed in time by the various defendants. Moreover, not only is "a lack of knowledge of legal matters or procedures" an unacceptable excuse for failing to appear before the Court, it is also disingenuous since the documents were sent to the *legal office* of the Municipality. If the legal office cannot comprehend the importance of responding to and reviewing a summons in a timely manner, then the Municipality's problems do not stem from a lack of knowledge but rather from incompetence.

ty a month after plaintiff filed their motion for injunctive relief and three weeks after defendants had filed their request to set aside the injunction. The new Ordinance 9, Series 2003–2004, sought to amend Ordinance 4 by specifying that the Center was a nonpublic forum "created with the specific purpose of developing art and culture in our citizenry in a wholesome environment and for repress [sic] enjoyment of all the family members." (Dkt.29).

## DISCUSSION

■ Defendants argue that the injunction should be set aside because: 1) the Center is a nonpublic forum and thus distinguishable from the theater at the heart of the Supreme Court's decision in *Southeastern Promotions;* 2) there was no valid contract between the plaintiff and the Municipality; and 3) plaintiff has not met the standard for obtaining a preliminary injunction by failing to demonstrate irreparable harm.

### 1. The Center's status as a public or nonpublic forum

Defendants assert that unlike the municipal theater in *Southeastern Promotions,* the Municipality's Center is in fact a nonpublic forum and thus subject to less constitutional scrutiny. Under the Supreme Court's analysis in *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), government property can be classified into three different categories: (1) traditional public forums like streets, sidewalks, and parks which "by long tradition or by government fiat have been devoted to assembly and debate." *Id.,* at 45, 103 S.Ct. 948; (2) designated public forums which the state has thrown open to the public for a range of limited expressive activities such as university meeting facilities and public theaters; and (3) nonpublic forums such as

airports, military areas, and federal workplaces, which by tradition or design are not appropriate platforms for unrestrained communication.

■ The classification of a particular forum has a tremendous impact on the level of discretion government officials are given in regulating the conduct in that forum. In a traditional or designated public forum, "reasonable time place and manner regulations are permissible and a content-based prohibition must be narrowly drawn to effectuate a *compelling* state interest." In contrast, in nonpublic forums, the "state may reserve the forum for its intended purposes communicative or otherwise, as long as the regulation on speech is *reasonable* and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.,* at 46, 103 S.Ct. 948 (emphasis added). *See also New England Regional Council of Carpenters v. Kinton, Jr.* 284 F.3d 9, 20 (1st Cir.2002); *Paulsen v. County of Nassau,* 925 F.2d 65, 69 (2d Cir.1991) (in a nonpublic forum, "the state has maximum control over communicative behavior since its actions are most analogous to that of a private owner").

The Municipality argues that its decision to prohibit plaintiff's production based on the content of the musical is permissible because the Center is a nonpublic forum "designated for a specific purpose or objective, which is the development of the arts and culture in the community in a safe and sound environment for the enjoyment of *all the members of the family.*" (Dkt.14). However, defendants have not provided an iota of support for this assertion. First, defendants fail to understand that limiting access to the Center does not transform it into a nonpublic forum. Designated public forums are by definition creating for limited purposes such as "the development of the arts and culture in the community."

Hence, while political rallies are prohibited from the Center because they do not comply with this specific purpose, this does not change its very character or classification.

■ Similarly, defendants self-serving statements that the forum is indeed non-public are not sufficient. "The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. District of Columbia Armory Board*, 863 F.2d 1013, 1015 (D.C.Cir.1988) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). However, "[i]ntent is not a merely a matter of stated purpose" *Stewart*, 863 F.2d at 1016. Instead it must be inferred from a number of *objective* factors including the government's policy and purpose for creating the forum "as well as the nature of the property and its compatibility with expressive activity." *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir.1991) (citing *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439).

The key piece of evidence presented in this case demonstrating intent is the Municipality's Ordinance No. 4 which established the Center. According to the ordinance the facility is designed for a number of "public uses" and for the promotion of "culture, education and recreation, offering moments of leisure and relaxation to the general public." The Center is intended for the development of "cultural activities of a musical or literary as well as of a theatrical type." (Dkt.39). These statements coupled with the fact that government owned theaters are generally public in nature leads the Court to conclude that the Municipality intended to dedicate the Center to a broad range of expressive activities compatible with a public forum. *See Southeastern Promotions*, 420 U.S. at 563, 95 S.Ct. 1239 ("[a] municipal theater is no less a forum for the expression of ideas than is a public park, or a sidewalk, the forms of expression adopted in such a forum may be more expensive and more structured than those typically seen in our parks and streets, but they are surely no less entitled to the shelter of the First Amendment.").

■ However, the Court's inquiry does not stop here. City officials may limit forms of expression that are not compatible with the designated particular use of a public forum. *United States Postal Service v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 136, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (for public forum analysis, "the crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). Defendants allege that the purpose of the Center is to promote "the development of the arts and culture in the community in a safe and sound environment for the enjoyment of *all members of the family*." Accordingly, defendants imply that the nudity in plaintiff's production would not be compatible with this purpose. This argument is most disingenuous and is in fact an attempt by the defendants to mislead the Court. There is no mention of "family" in Ordinance No. 4 and no indication that all performances at the Center must always cater to all age groups. In fact its just the opposite. Section IV D states that "[u]shers who are minor [sic] may not participate in adults-only show...." (Dkt.29). This is sufficient for the Court to conclude that the Municipality intended to create the Center in order to promote and present a variety of different types of performances that have artistic merit but that may or may not be suitable for minors. This is reinforced by defendants failure to demonstrate any consistent practice of limiting

performances that are not appropriate for children.

■ In a transparent last-ditch effort to circumvent the First Amendment and to change the nature of the Center defendants also submitted to the Court the text of Ordinance 9 passed on November 4, 2003. (Dkt.29) This ordinance seeks to transform the theater into a nonpublic forum for the development of art in a "wholesome environment and for repress [sic] enjoyment of all family members." First, this ordinance was passed after the initial injunction had been issued by Judge Garcia–Gregory. Accordingly, the Court will not entertain it. Moreover, even if the Court were to consider the text of the Ordinance as evidence of the Municipality's intent, the Court is not convinced the government would be able to unilaterally change the very nature of the forum. As the Fifth Circuit noted, "[i]t is conceivable. . . . that a city could announce. . . . that the forum was to be used 'only for non-offensive' or 'truly artistic productions.' While this hypothetical presents a hard case for public forum analysis, we do not believe. . . . that a municipal theater could be transformed into a nonpublic forum simply by the government's announcement that it is not intended to *be* a public forum." *Estiverne v. Louisiana State Bar Ass.,* 863 F.2d 371, 380 n. 14 (*citing Cornelius,* 473 U.S at 802, 105 S.Ct. 3439). Accordingly, Ordinance 9 has not changed the fact that plaintiff's production is compatible with the limited and designated purpose of the Center.

Finally, it is important to note that even if the Court were to construe the Center as a nonpublic forum, it is unlikely that defendants' actions would even pass the lower constitutional threshold accorded to such forums. According to the Supreme Court, any regulation barring expressive activity from a nonpublic forum must "not

be an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Assn.,* 460 U.S. at 46, 103 S.Ct. 948. The Court believes that the Municipality's actions are in fact just that, an attempt to suppress plaintiff's artistic expression because of their discomfort with the content of the show. While the performance may be controversial and even unpopular, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions,* 420 U.S. at 558, 95 S.Ct. 1239.

This decision, however, does not mean that defendants will be required to allow obscene or sexually graphic productions to be performed on stage at the Center. The Supreme Court has "rejected the contention that the First Amendment's protection includes complete and absolute freedom to exhibit. . . . any and every kind of motion picture. . . even if this film contains the basest type of pornography. . . . " *Southeastern Promotions,* 420 U.S. at 558, 95 S.Ct. 1239 (quoting *Times Film Corp. v. Chicago,* 365 U.S. 43, 46–47, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961)). Instead, what the law requires is vigorous procedural safeguards including a judicial determination as to whether a specific form of speech is indeed obscene. In this case, defendants have never argued that plaintiff's show is "obscene" per se and the fact that it has been performed in numerous cities throughout the United States and around the world would indicated otherwise.

**2. The validity of the contract between plaintiff and the Municipality**

■ Defendants' second argument is based on the premise that plaintiff did not have "a pre-existing relationship with the Municipality of Aguada for the presenta-

tion of the play 'Chicos Bailando y Desnudos.'" (Dkt.14). In support, defendants allege that plaintiff never complied with the various provisions of Ordinance 4 setting out the procedures necessary for obtaining a lease for the Center. "Pursuant to general contract principles, the intention of the parties is the foremost consideration in contract interpretation." *Coastland Construction, Inc. v. F.O.M. Puerto Rico* (D.P.R.2002). (citing Art. 1233, Civil Code, PR. Laws Ann., Tit. 31, Sec. 3471) ("If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."). In this case, the Court believes that there is sufficient evidence to indicate that the parties had intended to enter into an agreement to allow plaintiff to perform at the Center. Specifically, the Court finds most persuasive the letter sent by defendants to "notify [plaintiff of] the cancellation of the play Chicos Cantando y Desnudos scheduled for October 10, 2003." The letter which states that the decision was "due to last minute reasons and great weight" gives no indication that defendants truly believed that they did not have a valid contract with the plaintiff. (Dkt.36). On the contrary, the use of the term "cancellation" indicates otherwise since one cannot cancel a contract that supposedly never existed. Moreover, the Court believes that the 50% deposit defendants accepted from PGE was sufficient consideration and further evidence that both parties had bargained for and entered into a valid contract. Defendants, argue that this substantial deposit was simply "to reserve the specific dates" requested by the plaintiff pending approval of the contract by the Municipality. (Dkt.14). Unfortunately, neither the ordinance nor the affidavit submitted by the administrator for the Center purports to require such a substantial deposit strictly for the purpose of reserving a date. Irrespective, the Court does not

believe that whether or not the requirements of the ordinance were followed are at issue in this case. As the Court has already ruled, even if there was no valid commercial agreement between the parties, the First Amendment would prohibit defendants from unilaterally rejecting any application by the plaintiff. Indeed, when a similar issue arose involving the Municipality of San Juan, the local court held that "it is unnecessary to consider their argument under the contracts and obligations theory because the controversy is about freedom of expression." Rather, the Court ordered the Municipality to simply "formalize the lease contract" entered into with the plaintiff. *See Producciones Gran Escenario Inc. v. Jorge Santini Padilla* (San Juan Superior Court, KPE 2003-1953, August 28, 2003) (Dkt.36). Accordingly, defendants contract assertion is neither dispositive of the issue nor persuasive enough for the Court to set aside the preliminary injunction.

### 3. Plaintiff's irreparable harm

■ Finally, defendants argue that plaintiff has failed to meet the four part test required for injunctive relief. *See Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir.2003) (citing *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir.2001)) ("To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."). Specifically, defendants allege that plaintiff has not suffered irreparable harm because the show may be produced at a later date and because plaintiff has failed to demonstrate that it has incurred any financial costs as a result of the cancellation. (Dkt.14). This

is fundamentally incorrect. As the Supreme Court has noted, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (*citing New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). Hence, defendants third and final attempt to justify its attempt to circumvent plaintiff's fundamental rights is also without merit.

Accordingly, for these reasons, the Court hereby **denies** defendants' motion and **reinstates** the preliminary injunction order issued previously by Judge Garcia–Gregory. Since the initial dates for the performance have long passed as result of defendants failure to appear before the Court in a timely manner, defendants should note that the "effects [of the injunction] will be applicable to any other three dates that the defendants may have available and that PGE may request." (Dkt.9). Failure to comply with the provisions of the preliminary injunction order in good faith shall result in sanctions.

**IT IS SO ORDERED.**